Mr. Clerk, will you please call the next case? Clause 16, 1651, Petra Flores v. Executive Managers Counsel may proceed. Thank you, Your Honor. May it please the Court, Mr. Ullrich, my name is Frank Gaunt. I am here representing the affidavit petitioner, Ms. Petra Flores. It is our position today, this case is here on cross appeals, but it is our position today that the decision of the Commission that awarded a 5% loss to the man as a whole and found that my client merely suffered a back strain as a result of the April 9, 2008 accident is against the manifest way of the evidence. Furthermore, the reliance by the Commission on the utilization reviews, the blind following of those utilization reviews, led to an absurd and illogical result. Taken as a whole, then, the utilization reviews and the reliance on the IME of Dr. Julian Weiner is all against the manifest way of the evidence. Now, why is that? Dr. Weiner thought that my client suffered a back strain as a result of the accident. There was a positive EMG that showed that there was denervation at the L5-S1 nerve. Dr. Weiner saw that and ignored that. There was, in May of 2008, there was a MRI that showed herniated discs at L4-5 and L5-S1 with impingement on the fecal sac. The fecal sac is part of the neural structure of the spine. It also showed a 7-millimeter large herniation at L5-S1 and I think it was a 4-millimeter herniation at L4-5. A 7-millimeter herniation is larger than a quarter of an inch. I think that's a large herniation even though Dr. Weiner does not believe so. Your point is specific evidence of an injury. Didn't you also proceed or aren't you submitting a chain of events theory? I am, Your Honor. Prior to the April 9th of 2008, my client had worked for this company for two years. She had no prior complaints of back problems or any history of back complaints. There is no medical evidence in the record whatsoever that there was any type of preexisting condition here. Is there any evidence in the record as to what her condition was at all prior to this event? No, other than she was her normal healthy self. She actually testified she did not have back complaints or back problems prior to the accident of April 9th, 2008. Counsel, you alluded to Dr. Weiner. Who's Dr. Ross in this case? Dr. Ross? Yeah, was there any testimony by Dr. Ross? There was no testimony by Dr. Ross, and I think Dr. Ross might be the doctor possibly from Concentra because the doctors that she treated with after Concentra were from Markey Medicos, and then she was referred to Dr. Espinoza, then Dr. Jane, and Dr. Lorenz, and Dr. Franz. Are you saying you never heard of a Dr. Ross in this case? I've heard of a Dr. Ross, but I'm not familiar. Unless I'm missing it in the record someplace, Your Honor, I'm not familiar with a Dr. Ross, unless she's from Concentra. Well, she didn't weigh in on, or he didn't weigh in on symptom magnification, including with Dow signs for overreaction and distraction. Dr. Ross had nothing to do with that, no reports, nothing? Not that I'm aware of, Your Honor. Okay. Cindy Ross examined him at Concentra. Pardon me? Cindy Ross is the doctor's name. She examined him at Concentra immediately after the accident. I knew she was examined at Concentra. I did not remember the doctor's name. Okay. Did she testify or provide any testimony in this case? All of her medical records, no. But did her medical records indicate symptom magnification? I understand that. But what is the symptom magnification based on? It's based on the Waddell signs. Correct. And the Waddell signs, Your Honor, Dr. Lorenz testified to it, and I submitted to this court the seventh edition of the AMA guidelines, which says that Waddell signs are only indicated for English-speaking citizens, people. They are not considered valid for Spanish-speaking people because of cultural differences. And Dr. Lorenz testified to that. In spite of that, Dr. Wainer relied on the Waddell signs. Even though my client was Spanish-speaking, it had to have a German sign. Well, but besides that, didn't Wainer and Ross also talk about negative leg raises, non-anatomic sensitivity to touch? Does non-anatomic sensitivity to touch have anything to do with language? It has to do with the Waddell signs. Yeah, but you said this was a language. You can't use Waddell here where there's a language issue, correct? Correct. You just said that. Yes. Does non-anatomic sensitivity to touch have anything to do with language? Yes or no? In and by itself, probably not. Okay. But to do these Waddell tests and signs, which the sensitivity to touch is part of it, is invalid for Spanish-speaking people. This is fascinating me now. The Waddell test is an interpretive test of reactions by the patient, right? Upon examination. Yes. Okay. What is the expression of those reactions by the patient that are being interpreted? Well, some of the expressions would be whether they, you know, wince or if they're out of, you know, they have pain behaviors that are out of proportion to what the doctor Well, okay, expression. How are they expressed? Okay, you say wincing. Now we're talking about communication, verbal, nonverbal communication. How are they expressed? By wincing, by, you know, compression. If there's a certain test that might not elicit any pain and the patient might express some pain. That's what I'm trying to get at. And so apparently you're suggesting that the Waddell test, because expression by non-native English-speaking people, they express differently. Correct. And so what might well be an expression of ouch by an English-speaking person, some non-native English-speaking person would be yelling, right? Yes. And so the point is is there's no common metric to really make an inference that there's that level of pain being experienced. Correct. Okay. And they defer to the doctors and the doctor's opinions differently than an English-speaking person would. I want to understand. If a doctor tries to manipulate someone's body part to determine whether the person has pain, Spanish-speaking people have different pain than English-speaking people? No, pain is the same. So if a doctor manipulates a body part that the doctor knows is not injured and yet the person exhibits pain or cries out in pain, that would be the same, the doctor would make the same conclusion for a Spanish-speaking person as an English-speaking person if they're guilty of symptom magnification, wouldn't they? They should, but they do. Wait a minute. Hold on a second. If a doctor manipulates a body part on an English-speaking person that is not injured and yet they exhibit incidents of pain or exhibit pain and the doctor concludes symptom magnification, there's nothing wrong with that body part, they shouldn't have cried out in pain, that it would be different if they did the same thing to a Spanish-speaking person? The pain behavior with a non-English-speaking person, or in this case a Spanish-speaking person, the studies show are different. And because of the cultural differences. Now, are those studies in the record? They are not in the record. I cited to the AMA... I understand they're not in the record. That's why I asked the question. Lorenzo's opinion. Did they all be in the record with Dr. Lorenzo's opinion? Yes. Counsel, just as a reminder, you probably were going to say this, but attached to your appendix, the guides to the evaluation of permanent impairment by the AMA, it states Waddell's signs are not valid in non-Anglo cultures as their reliability has been tested only among English and North American patients. How does that impact on this case? Because Dr. Winger relied on those informing her opinion, that my client merely suffered a back strain. Well, she also relied on negative bilateral leg raises, too. Right, but within a few days of that report and her examination, she was examined by Dr. Espinosa, who found that there were positive leg raises. I understand what you're saying, but it's not based solely on the Waddell symptoms. She also based it on negative bilateral leg raises, and evidently the commission bought it. The stuff that you have in the back in your appendix relating to the Waddell signs and the AMA guidelines, I found nowhere in the record. I found them in your appendix, but I didn't find them in the record. Could you tell me what page they appear in? They do not appear in the record. I provided it as an appendix so the court wouldn't have to go digging through the AMA guidelines to find it. That's why it's attached to my appendix. But by relying on Dr. Wader's opinions, the commission ignored all the objective tests and findings, the clinical findings, the ENGs, the MRIs, the discogram, the post-discogram CT scans. My client failed conservative care of the injections that were administered by Dr. Jane. The pain never became alleviated. Now, the commission also relied on the, as Justice Hudson pointed out to me, Dr. Ross's opinions from Concentra that there was symptom magnification, but, again, she was applying to Waddell signs. There's something that you missed. When Dr. Ross examined your client at Concentra the first time, she found bilateral leg raises were negative and also observed Waddell signs of overreaction and distraction. That's what the record says, but the negative leg raises is consistent with the type of injuries she had. There was also objective testing, though, that supported Dr. Wader's opinion, right? The neurological tests that were performed, they were read as normal. Is that right? No. The ENG actually showed, Judge, acute denervation in the L5S1 nerve. Okay. So Dr. Wader's, that basis for Dr. Wader's opinion is flawed? Yes, I believe it is. Okay. All right. What about the radiographic studies that would indicate, or that Dr. Wader suggests, indicates that the L5S1 disc herniation did not significantly impinge on the nerve root and wouldn't cause the type of leg numbness that the claimant was complaining of? It showed, what Dr. Wader did state was that it showed impingement at two levels. On the fecal sac, which is the outside structure of the neural structure in the spine, it showed an L4-5 and an L5S1. So there was at least some pressing on that fecal sac, which houses the nerves. So with a 7-millimeter herniation, it certainly could cause pressure on those nerves, causing some pain radiating down the legs. I understand he disagreed with her opinion, but didn't Dr. Wader say that that wasn't significant? She didn't. Yes, she did. But I think because there was, she made it sound like there was no impingement when in fact there was. But what Dr. Wader did not address here was the segmental instability that was found here by Dr. Lorenz and Dr. Franze. My client injured herself by bending and picking up these 25-pound boxes, 25-30-pound boxes, of mailers containing mailing equipment and putting them on a counter. It doesn't show her putting them on the counter in the video, because the woman who was doing the acting during the video didn't put them on the counter. But my client testified that she did. She did that many times during the day, but at 8.45 on the 9th of April, without any prior history of back pain, she was doing that and felt a pop in her back. It's interesting to note that at the first IME that Dr. Gwener did in June of 2008, she said that those bins only weighed .6 pounds, just a little over 9, between 9 and 10 ounces. She didn't, and then at their deposition she testified she had no idea what those bins would weigh if they were full of mail. As a result, I think that if you take the entire history, the segment of instability which causes back pain, it doesn't cause the radiation, but it causes the back pain, and then the progression of the disease where it got worse and then started radiating down her legs, is consistent with what was found at Concentra initially. It's actually fairly consistent with what Dr. Wainer found at her June 2008 exam, but it progressed. It got worse as time went on. And that's what Dr. Espinoza found. That's what Dr. Lorenz found, Dr. Franzek and Dr. Jane. Her condition worsened to the point where she couldn't work. She attempted to work late duty for a month after the accident, but the pain got worse. And that's when she was taken off of work in May of 2008. She got released and returned to work fairly quickly after the surgery. It was August 31st of 2009. All right, so let me see if I can sum up your position. There's evidence in the record to support the claimant's position, both by chain of events and the other physical evidence. Obviously, there's contrary evidence, particularly with the Weidel tests, that are pointed to when you're saying they're invalid here because of the language issue. Correct, and the cultural differences. Okay. As to the award of medical bills, it's actually kind of ludicrous what the commission did in this case. They relied blindly, and this dovetails with the cross-appeal. The commission and the arbitrator relied blindly on the utilization of the tools. So what's the result? We have some physical therapy initially that was awarded. We have three series of injections, epidural injections, that are awarded. And even though Dr. Weiner says it's just a back strain, we have three epidural injections awarded here. We have certain other tests awarded, and we have the MRI knocked out, and we have the surgery knocked out, and the utilization review relied on Dr. Weiner's opinions as part of their basis for knocking out the surgery. And then we have the most ridiculous thing is the post-surgical physical therapy awarded. I mean, that makes no sense. I mean, you can't get it both ways. Either it's a back strain. If you lose your appeal on your issues, he necessarily wins his, because you're right, it's absolutely illogical. You can't award it after if you say it stopped on a certain day. Right. And the other, if you win, he loses. So, I mean, it can't be both ways. And, Judge, and that's why I say the argument is dovetail. Very good. With that, Connors, I ask you to please reverse the commission and find that my client suffered a herniated disc that required discs that required surgery as a result of the April 9, 2008 accident, award medical TTD, and increase the permanency. Thank you all very much. Thank you, Counsel. Do you all have time to reply? Counsel, you may respond. Thank you. Brad Overton on behalf of Executive Mailing Services. Obviously, our position on the primary appeal is that the commission's decision should be affirmed. I think, as this Court's questions indicate, you understand this case really is all about both the appeal and the cross appeal, about the issue of causation. And when we look at what the commission did here and the basis for their ruling, they found that there was no causation based on three points. First, they said the petitioner was not credible. She magnified her symptoms. She over-treated. Second, they said the medical opinions in the case by the petitioner's physicians were inconsistent with the facts. And I think there, while they don't specify that in a great deal about which ones they're referring to, when we look at Dr. Lorenz's opinions in his deposition, and we look at the cross-examination, you can clearly see that the basis that he had for his opinions lacked an understanding of some of the primary facts that the petitioner testified to at arbitration about what happened in that first five to six weeks after her April 9th accident. His lack of knowledge of that impacts his opinions, and I believe that's what the commission was referring to when it said that the evidence in the case, the medical opinions are not consistent with the facts. Can you briefly respond to his argument that the symptom magnification hinges on the Waddell test? He says it's invalid in sites of study. Is there independent evidence of the symptom magnification and overreaction independent of the Waddell test? Well, I thought Dr. Lorenz had made some references to that, but the AMA reports that you had referred to that you talked about that were in the appendix of the brief are not in the record. Again, this was before the commission. These arguments were before the commission as a finder of fact. They have the ability to look at those, listen to those, and say, well, we just don't think those are applicable here. And I think many of the reasons that the courts already pointed out about what the purposes of a Waddell test is and they're looking for maybe, even if you assume that there's a language barrier, there's not an observation barrier. If I do something that's a false test to see whether or not it provokes something when it shouldn't and you respond in a certain way, I don't care what language you speak. I'm going to watch you make a physical response. You're saying illogically a nonverbal reaction, if you will, doesn't depend on the language. Absolutely. Absolutely it does not. And I think the courts have seen enough cases with Waddell signs and tests to know what those are. I think clearly that was brought up before the commission. They rejected it and moved on. Essentially what we have here are two focal points of evidence for the employer that the commission relied upon. First of all is the evidence that took place, the medical evidence that came out of the concentric treatment, which, as the court pointed out, found really no other, on the 421 examination, no other negative findings. The straight-leg raising test was negative. I think there was some limited restriction of motion, which one would expect with a back strain. And a week later we have Petitioner improving. No numbness, no tingling, and we have the comments with respect to the symptom magnification and I forget the other phrase that they used, but essentially it was positive Waddell sign. Those were significant not only to the commission but also to our IME physician, Dr. Winner, who, as the courts already pointed out in your questioning, went through a very detailed analysis pointing out why these particular tests, why the results either didn't indicate in this petitioner that there was a problem that connected her condition ability and arbitration with this accident or explained why you can have a positive finding on some of these tests and still not have a causal relationship. I think it's important here when we look at what the counsel is essentially saying is if I come to you with a basket of positive test results on myself and say, ha, I'm hurt at work, the first thing you're going to ask me as an experienced comp person is you're going to say, how is that causally related that you have a positive XYZ test? Well, that's what's missing here. They can have the positive MRSAIs. They can have the positive EMGs that got causally connected. And while Lorenz did, there were some flaws in his testimony. Dr. Weiner looked at this, and she said, I don't think it's connected and offered a very good explanation of the grounds as to why, what the significance of the negative straight leg rating tests were. But what else? She interpreted what the MRI results were and said the MRI results from the main studies did not match with any subjective complaints. These were her opinions. Were there holes in some of those, as counsel tried to point out? Probably so. But we always get imperfect opinions from our medical providers. I don't care what side they're on, whether they're treaters or whether they're IMEs. But the commission resolves those holes and says, given the testimony with these possible problems, which one of them am I going to believe? And in this case, they chose. What was the testimony as to this woman's condition, the condition of her back, prior to the April 9, 2008 incident? I think the only testimony, Your Honor, if I'm remembering correctly, is her own comments that she had no problems before. And I think we cannot rely on that as far as using the chain of events analysis here. Because I do think, without specifically saying I find the petitioner not credible, I think that's, in essence, what the commission has done. So if she lacks credibility, I don't know how we could take her testimony at face value and say she was in excellent condition and apply the chain of events theory. Well, the reason why I ask the question is because the event allegedly happens on April the 9th. Yes. She gets an MRI on May the 15th. May the 15th shows disc protrusions, two herniations, and the EMG, I guess, in the following day shows an acute denervation. And there's a CT scan that was done, what's the date, October. It indicates concordant pain at L45, L5S1. It indicates annual tears, L45, L5S1, with mild central canal stenosis due to the disc bulges. So my question is, if she was okay prior to April 9th, what happened between April 9th and May the 15th caused these herniations? Again, I'm not sure we know that. Well, I know, and Dr. Wiener gave all sorts of reasons why she says that she bases her opinions that it didn't cause anything but a simple strain. And she bases it, firstly, by saying that her leg raises, which according to her was the most accurate means for testing whether her derniated disc was symptomatic, was totally negative. Secondly, that the disc herniations at L5S1 did not significantly impinge on the nerve root and would not cause the numbness that she reported. And thirdly, she says that the lower back pain with axial compression and axial rotation, which is a Waddell sign indicating symptom identification, that is the Waddell sign. Fourthly, she says that she reported no sensation to light touch in a non-anatomic distribution which varied over the course of the exam of the entire leg. And fifthly, she found no medical etiology to explain the pain that the claimant reported in her foot and ankle when she moved her hip. Lastly, she said all her neurological tests were normal. Now, that was the basis for opinion. It wasn't simply just the Waddell sign. But I'm still troubled by the fact that we have no evidence of ill being prior to April the 9th. And a month and six days later, this woman has herniated discs and denervation. And there's no evidence of anything happening to her in between. And she did go, clearly she went to Concordia. When was the first time she went to Concordia? Several days after the accident? It happened on April the 9th. She went to Concordia on April the 17th. So she went eight days later. All right. There's a little difficulty on the end. No, it's a fair question, Your Honor. With the vertity on the petition to demonstrate the causal connection and with the observations that you just made, I think when we look at what Concentra found in that first three or four-week period and you compare those conditions with the conditions that you just went through, Your Honor, from May and moving on to the remainder of the year, I think it clearly indicates that something happened with this lady in that window or after the end of April. And I don't think there's anything to explain what that was that would, one, tie into the work, and two, that would tie the types of injuries that she had into the original injury of the April 9th. And I think Dr. Wainer addresses that, and she explains that. Now, while they may disagree with that and while there still may be some holes, again, it's their burden and it was the commission's prerogative to look and see what are we going to tie to, what conditions are we going to tie to the original accident. And when you've got that three-week period where she goes to Concentra and essentially has no significant findings, straight leg raising is negative, Waddell signs are present, and she's reporting she's getting better, has no numbs, no tingling. And then we have another window from I think it was June 11th when Dr. Wainer first examined her. Again, those types of similar types of findings. Maybe something happened, but there's nothing to tie it into the work. And while Dr. Lorenz may have tried to explain that, I think Dr. Wainer offered an explanation contrary to that, and so it became the commission's decision to decide which one of those two that it was going to follow. And I think one sentence that might be indicative is a sentence where the commission says, it is not legal that a petitioner sustain more than a lumbar strain sprain. And when we tie that back to their comment earlier in that paragraph, her work duties involved only light lifting with some bending and twisting. That's what they found. They looked at the type of job. You know, I got to ask you also, when Dr. Ross examined this woman on April the 17th, she found tenderness in the muscles between L4 and S1. Now, that's eight days after the event at work. And the MRIs of May the 15th show disc protrusions at L3-4 and broad-based central herniations L4-5 and L5-S1. So the MRIs established that there is a herniation in the area of L4 to S1, and Dr. Ross found tenderness between L4 and L1 and a decreased range of motion eight days after the event. So now I guess we have to say something happened to this woman between April the 9th and April the 17th. Well, you know, I think the question there is, is the condition that Dr. Ross found on the 17th indicative of a strain sprain, or is it indicative of a herniated disc? And while there may be overlap, the commission needed to decide which one it felt it was, and it chose to find that this was indicative of a strain sprain. Is there any doubt that on May the 15th this woman had herniated discs? I can't say that. Well, we've got an MRI. The MRI says they're herniated. Did you say April 9th, or did you say the May day? The May day. Is there any doubt that May she had herniated discs? On the day of the MRI, I think it says what it says. I'm sorry. I thought you said on April 9th. Well, the reason why I say that is because the herniated discs that are found in May in the MRI certainly exist within the area of L4 and S1, and Dr. Ross found tenderness between L4 and S1 on April the 17th and also found a decreased range in motion, but did in deference say that the bilateral leg raises were negative. I guess my response is what says that the result of the MRI from mid-May, the results that were shown were caused by the April 9th event, and there isn't anything. We have Dr. Lorenz who offered his opinions, and we have Dr. Wiener, and Dr. Wiener's explanation and the commission chose to rely on her. Are you saying in so many words there's no specific causal connection, opinion, tying the herniated discs to April 9th? Is that your position? I think so, and I think that that's because there were some problems with Dr. Lorenz's opinions that were noted in the cross-examination, and I believe, and I guess I'm assuming here, so hopefully not in the wrong way, but I believe that's exactly what the commission was referring to when they said that the medical opinions are not consistent with the facts and therefore I disregard all the petitioners of medical providers. If I could take just a second to discuss my cross-appeal, I think it's a very straightforward point. I agree with the court's comments to counsel about disposal of one disposes of the other, et cetera. The only way I can explain what the commission did with respect to the award of the 2009 permanent physical therapy is that they just made a mistake. They were looking at the documents that the U.R. approved, and they threw them in. There's no other way to explain it because it has to be a causal connection, which they said is separate, and so I don't know how they could find what they did on causation, and there's evidence in the records. Mr. Elwood, I don't think there's any question. If he wins on causation, you lose on your cross-appeal. You win on your cross-appeal. If he loses on causation, you win on your cross-appeal. There's no question. They're absolutely inconsistent. We understand. Okay. Your time has expired. Thank you, counsel. Thank you, counsel. You may reply. Very good. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement the written disposition shall issue.